**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

CHRISTOPHER HUGHES,

        Plaintiff,

vs.                                              Case No. 3:12-cv-158-J-32JBT

CITY OF LAKE CITY,

        Defendant.

## ORDER

This employment discrimination case involving the Lake City Police Department is before the Court on Defendant's Motion for Summary Judgment and accompanying exhibits (Doc. 20), Plaintiff's Response and exhibits (Doc. 24; Doc. 25), and Defendant's Reply (Doc. 28). The Court held oral argument on Defendant's motion on August 30, 2013, and the transcript of that hearing is incorporated herein.

## Facts

Christopher Hughes was hired as an officer in the Lake City Police Department on August 17, 2009; his brief, but tumultuous, tenure ended on February 8, 2011, when he was fired. (Doc. 24-2 at 2).

On February 16, 2010, Hughes filed an internal complaint alleging that his commanding officer at the time, Sergeant VanBennekom, used a racial slur. (Doc. 24-18 at 2). On July 19, 2010, Hughes' then-supervisor, Sergeant Barfield, asked him if Hughes' patrol car was ready to be picked up from the repair shop. (Doc. 24-1 at 2). After being told by Hughes that the car was not ready, Barfield went to the repair shop, where

he was told that the car was ready and that Hughes had been informed of this fact days earlier. (Doc. 24-1 at 2). As a result, Barfield began a supervisor's investigation into whether Hughes had lied about the status of his car. (Doc. 24-1 at 2).

On August 7, 2010, Hughes submitted a questionnaire to the EEOC as the first step in making a claim of racial discrimination. (Doc. 24-28). On September 8, 2010, he sent an e-mail to Sergeant Blanchard complaining that Barfield created a hostile work environment. (Doc. 24-10 at 2). On October 22, 2010, Hughes sent a notice of a charge of discrimination to Chief Gilmore. (Doc. 24-13). On October 25, 2010, Hughes filed his complaint of discrimination with both the city manager and the EEOC. (Doc 24-5; Doc. 24-27). That same day, Chief Gilmore converted Barfield's supervisor's investigation into a more serious Internal Affairs investigation ("IA"). (Doc. 24-12). During the course of the investigations into Hughes' conduct, the investigators also became aware that Hughes had driven a car that he believed to be unsafe. (Doc. 24-16 at 10-12). As such, Hughes was also investigated for neglect of duty. (Doc. 24-16 at 18). On February 8, 2011, Gilmore fired Hughes for providing false information and neglect of duty. (Doc. 24-2; Doc. 24-3).

Hughes subsequently filed suit in this Court, charging one count of racial discrimination and one count of unlawful retaliation under the Florida Civil Rights Act, Chapter 760, Florida Statutes, and 42 U.S.C. § 2000e, et. seq. (Doc. 1).[1] Defendant now

---

[1] Hughes has improperly combined his federal and Florida claims in the complaint. However, this defect is not material to the Court's consideration of the motion for summary judgment because claims under the Florida Civil Rights Act are analyzed under the same framework as Title VII claims. Horne v. Turner Construction Co., 136 Fed. Appx. 289, 292

moves for summary judgment. (Doc. 20).

## Law and Application

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a genuine issue of material fact where the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996).

### I.      Plaintiff Fails the McDonnell Douglas Framework

Under Title VII, no employer may fire or otherwise discriminate against an employee because of their race. 42 U.S.C. § 2000e-2(a)(1) (2012). To succeed on a discrimination claim based on circumstantial evidence, a plaintiff generally must make it through the three steps of the McDonnell Douglas framework.[2] Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1325 (11th Cir. 2011). As the first step in this framework, the plaintiff must prove that, "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." Maynard v. Bd. of Regents of Div. of Universities of Florida Dep't of Educ. ex rel. Univ. of S. Florida, 342 F.3d 1281, 1289 (11th Cir. 2003). Here, the City alleges that the plaintiff failed to meet the second and

---

(11th Cir. 2005).

   [2] Hughes' claim is based on circumstantial evidence, not direct evidence. (See Doc. 25 at 2-11).

3

fourth requirements. As Hughes fails to meet the fourth element, the Court need not address the second element.

The fourth element of Hughes' prima facie case is proof that he was treated less favorably than a similarly-situated individual outside his race. To meet this element, the employee and his comparator must be engaged in nearly identical conduct and have been disciplined in different ways. McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008); Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Both the quality and the quantity of misconduct must be nearly identical for the other individual to provide an adequate comparison. Id.

Hughes was fired as a result of charges of neglect of duty and providing false information after he allegedly drove a car he believed to be unsafe and lied to his superior officer about his car's availability. (Doc. 24-3). Hughes alleges that there are ten white officers who committed comparable acts but were not fired. (Doc. 25 at 16). All but two of the listed officers engaged in conduct that on its face is far from identical to Hughes' alleged misconduct. (See Doc. 25 at 10-11). Moreover, Hughes has provided no details of the circumstances involving these eight officers.

That leaves two officers. The officer who engaged in the most similar conduct is Larry Butler, who was fired after, amongst other things, an IA investigation into charges of untruthfulness after he lied to Barfield about his patrol car's availability. (Doc. 24-82 at 3-4). The only difference in treatment between Butler and Hughes is that Butler was re-hired so that he could resign. (Doc. 24-82 at 4). (Hughes made no such request.) Thus, Butler was effectively terminated for his misconduct, just as Hughes was.

4

Plaintiff's second-best comparator is Larry Shallar, who was allegedly disciplined but not fired after falsifying documents and engaging in neglect of duty, which Hughes analogizes to his own charges of giving false information and engaging in neglect of duty. (Doc. 25 at 10). Shallar was charged with falsifying time sheets and failing to note wounds in a report on a domestic violence situation. (Doc. 24-68 at 23).

However, the resolution of Shallar's case is uncertain. Former Captain Rudolph Davis testified that Chief Gilmore overturned the charges against Shallar, effectively exonerating him. (Doc. 24-82 at 4). Former Investigator Eddie Black suggested that the two charges against Shallar were sustained, but stated that he did not know what discipline Shallar received. (Doc. 24-68 at 24-25). Plaintiff has only provided excerpts of Shallar's deposition (Doc. 24-69) and it is unclear from those excerpts how similar Shallar's situation was to that of Hughes.

The Eleventh Circuit has taken a very strict view of what constitutes "nearly identical conduct." See, e.g., Stinson v. Pub. Serv. Tel. Co., 486 F. App'x 8, 10 (11th Cir. 2012) (finding that plaintiff had failed to provide an adequate comparator since "[n]o comparator falsified bank records", as plaintiff allegedly had). It has done so to prevent courts from second-guessing an employer's decision, and from confusing apples with oranges. Burke-Fowler, 447 F.3d at 1323. Thus, for example, hanging up the phone on a supervisor during a heated conversation is not nearly identical conduct to making threatening comments to a supervisor. See Roxbury-Smellie v. Florida Dep't of Corr., 324 F. App'x 783, 786 (11th Cir. 2009).

The decision in McCann demonstrates that it is the nitty-gritty facts of the

underlying conduct, not the general labels for that conduct, that must be nearly identical. McCann, 526 F.3d at 1374. In McCann, the plaintiff, a corrections officer, was disciplined for conduct unbecoming an employee in the public service, disorderly conduct, and the violation of a lawful and reasonable regulation after she was disrespectful to a sheriff and his deputies while wearing her uniform off-duty. Id. at 1372. The plaintiff attempted to use, as a comparator, a co-worker who was convicted of disorderly conduct and resisting arrest after a dispute with her daughter-in-law. Id. at 1374. While both employees were charged with disorderly conduct, the court focused on the substance of the allegations, and distinguished them by saying that the comparator, who was not disciplined, did not engage in nearly identical conduct because, inter alia, her conduct occurred at a private residence while in plainclothes. Id.

Likewise, in Burke-Fowler, the court drew a fine distinction between a plaintiff and two comparators. Burke-Fowler, 447 F.3d at 1325. There, both the plaintiff and two comparators fraternized with inmates. Id. While the behavior was identical in that respect, the court still refused to find that the comparators were engaged in nearly identical conduct because the plaintiff began the romantic relationship with an inmate who had only recently left her supervision, while the comparators had pre-existing relationships with individuals that continued after the individuals became incarcerated. Id.

Under this standard, Hughes has failed to meet his burden of demonstrating that Shallar's conduct was nearly identical to Hughes'. Whatever similarities that Hughes has shown between Shallar and Hughes are insufficient as a matter of law to make Shallar a proper comparator. As such, Plaintiff cannot demonstrate that he was treated less

6

favorably than a similarly-situated individual outside his race, and he therefore fails to present a prima facie case under the McDonnell Douglas framework.

## II. Circumstantial Evidence of Discrimination

Even if the plaintiff's case fails under the McDonnell Douglas framework, he will still survive summary judgment if he provides "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Lockheed-Martin, 644 F.3d at 1328 (quoting Silverman v. Bd. of Educ., 637 F.3d 729, 734 (7th Cir. 2011)). The fundamental question then remains whether the plaintiff presented circumstantial evidence sufficient to raise a reasonable inference of intentional discrimination. Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012); Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997). Such evidence must be comparably powerful to evidence that the plaintiff was treated less favorably than a similarly situated offender. Bell v. Crowne Mgmt., LLC, 844 F. Supp. 2d 1222, 1233-34 (S.D. Ala. 2012).

In Lockheed-Martin, the "convincing mosaic" included evidence that suggested that the employer's justification for firing the employee was a pretext for racial animus, that the employer had a substantial incentive to discipline white employees more harshly than black employees, and that the employer consciously injected race considerations into disciplinary decision-making. 644 F.3d at 1341. Similarly, in Holland v. Gee, 677 F.3d 1047, 1063 (11th Cir. 2012), there was a convincing mosaic where the fired employee was treated differently after she informed her employer of her pregnancy, her employer even admitted that the employee was treated differently because of her

7

pregnancy, and the credibility of the ultimate decision-maker was heavily challenged at trial even far beyond the evidence rebutting his proffered reasons for firing the employee. 677 F.3d at 1063.

However, generalized allegations that an employee was treated differently because of their race do not qualify as a convincing mosaic. Turner v. Florida Prepaid Coll. Bd., 522 F. App'x 829, 833 (11th Cir. 2013). In considering the full range of circumstantial evidence, courts may consider whether there is substantial evidence that cuts the other way, including the race of the individuals responsible for employment decisions. Jackson v. United Parcel Serv., Inc., 12-CV-01753-WMA, 2013 WL 5525972, at *12 (N.D. Ala. Oct. 4, 2013). Here, the decision-maker, Chief GIlmore, like Plaintiff, is black. (Doc. 20-7 at 9). On the other side, Plaintiff presents four different types of evidence supporting his argument that he was fired for discriminatory reasons.

First, Plaintiff asserts that he did not in fact lie about his car's availability, since he did not know it was ready until he called the shop after his conversation with Sgt. Barfield. (Doc. 25 at 19). Other witnesses' testimony confirms that Hughes called to check on his car's availability after he told Barfield the car was not ready. (Doc. 24-16 at 6). However, the uncontroverted testimony also demonstrates that, at the time she made the termination decision, Gilmore considered a report in which two witnesses stated that Hughes had previously been informed that his car was ready, and a supervisor provided his assessment that Hughes had lied. (Doc. 24-16 at 4, 18). Presumably, Hughes erroneously believes that Gilmore's decision to credit those three individuals over Hughes demonstrates pretext. Hughes also contends that he was not guilty of the

neglect of duty charge, but provides no reason to believe termination on that ground would be pretextual. (Doc. 24-83 at 15).

Second, Hughes alleges that Defendant failed to follow typical procedures in his investigation and termination. Hughes was not told that his probation was extended until almost three months after it was supposed to end. (Doc. 24-83 at 11; Doc. 24-23 at 2). Officers are supposed to be notified about probation extensions at the time that their probation would have otherwise expired. (Doc. 24-71 at 20). Further, supervisors generally only investigate minor issues. (Doc. 24-73 at 4-5). Yet, Sgt. Barfield, Hughes' supervisor, conducted the initial investigation and recommended Hughes' termination well before concluding that investigation. (Doc. 24-75 at 9-11).[3] Importantly, Plaintiff offers no evidence suggesting that his race was the cause for these deviations from standard procedure.

Third, Hughes asserts that black employees were generally treated differently from other employees. Detailed evidence of discrimination against other employees may aid in a finding of discrimination in a given case. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1286 (11th Cir. 2008). However, a hodgepodge of unproven allegations of discrimination against others does not create an inference that Plaintiff himself was discriminated against because of his race. Davis v. Dunn Const. Co., Inc., 872 F. Supp. 2d 1291, 1318 (N.D. Ala. 2012). Plaintiff states that black officers were moved between

---

[3] Plaintiff also complains that the investigation took longer than the maximum 180 days allowed under the Florida Law Enforcement Officer's Bill of Rights, but that requirement does not apply where, as here, the violation of department rules was discovered internally. See McQuade v. Florida Dep't of Corr., 51 So. 3d 489, 494 (Fla. Dist. Ct. App. 2010).

9

shifts so that they would not be on the same shifts. (Doc. 24-83 at 19). However, Plaintiff has not provided any examples of shift schedules, nor any testimony beyond his own that supports this contention. Plaintiff also presents allegations from other African-American police officers who allege discrimination at the hands of the City. Robert Smith, an African-American captain, claims he was discriminated against and fired on the basis of his race. (Doc. 24-37 at 2-3). Smith's allegations, however, bear little resemblance to Hughes', as they assert that he was excluded from closed door meetings as a captain.[4] (Doc. 24-37 at 3). Former captain Rudolph Davis also makes a general allegation that Defendant engaged in race discrimination. (Doc. 24-82 at 2-3). However, Davis' claims of discrimination and retaliation were rejected, which decision was affirmed on appeal. Davis v. City of Lake City, Fla., 13-11340, 2014 WL 241754 (11th Cir. Jan. 23, 2014)

Fourth, Plaintiff argues that he was treated differently from his white colleagues. For example, he states that a supervisor failed to submit Plaintiff's training paperwork up the chain of command, but promptly submitted the paperwork for white officers. (Doc. 24-83 at 5). Beyond his own general testimony, Plaintiff's only evidence supporting this allegation is that his training requests were never approved by Gilmore, which does not mean that she never received his requests. (Doc. 24-9 at 2). In fact, record evidence demonstrates that Hughes' training requests were sent up the chain of command. (Doc. 24-44). However, Chief Gilmore thought that Hughes lacked the requisite skills and experience to be a candidate for training. (Doc. 20-7 at 5).

---

[4] Smith filed his own discrimination suit in this Court, which settled before the Court could rule on the City's motion for summary judgment. (3:12-cv-553-J-39PDB).

Plaintiff also states, without support, that he was called over the radio to make corrections to his reports, while white officers were not. (Doc. 24-83 at 7). Further and most seriously, Plaintiff contends that he was repeatedly left without backup. (Doc. 25 at 2-3). However, Plaintiff cannot provide any call logs, examples, or additional testimony to support this allegation, beyond a May 5, 2010 letter to command staff in which Plaintiff stated that he received no acknowledgment from dispatch on one occasion and was told that they did not hear him. (Doc. 24-42). Such technical difficulties with the radio were common. (Doc. 24-76 at 11).[5]

In all, Plaintiff's offered circumstantial evidence is unsupported by evidence from the record beyond Plaintiff's general allegations. Importantly, none of the evidence that Hughes claims demonstrates that he was treated differently on account of his race relates to actions taken by Gilmore, the ultimate decision-maker in his termination. Rather, Plaintiff's proof consists of his own testimony of discriminatory treatment by actors other than the ultimate decision-maker, that he presented some evidence in his defense in his IA investigation, and a hodgepodge of unproven general allegations of discrimination against other employees. A plaintiff's own testimony may, in some cases be sufficient to withstand summary judgment. Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1160 (11th Cir. 2012). However, even viewing all the evidence in a light most favorable to Plaintiff, there is no evidence of race-conscious decision-making, as there was in Lockheed-Martin and Holland, nor any other evidence substantial enough to form

---

[5] When asked at oral argument to document this serious charge that Hughes was left without backup, Hughes' counsel could not do so.

11

a convincing mosaic of circumstantial evidence of discrimination. No reasonable juror could find racial discrimination based on the evidence Hughes has presented.

### III.     There is an Issue of Material Fact on the Retaliation Count

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that he engaged in a statutorily protected activity and suffered a materially adverse employment action, and that the protected activity and adverse action were causally connected. Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1258 (11th Cir. 2012); Goldsmith, 513 F.3d at 1277. Once the plaintiff establishes these elements, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for the adverse action. Goldsmith, 513 F.3d at 1277. If the employer succeeds in this task, the plaintiff then must show that the reason provided is a mere pretext for prohibited retaliatory conduct. Id.

The City does not contest that Plaintiff engaged in statutorily protected expression both when he sent an e-mail to Sergeant Blanchard on September 8, 2010 claiming that he was working in a hostile work environment and when he filed a complaint with the EEOC on October 25, 2010. (Doc. 20 at 24-25).

Nor does the City dispute that Hughes was subject to an adverse employment action, termination. (Doc. 20 at 24-25). Moreover, in these circumstances, the initiation of an IA into Hughes' conduct was an adverse employment action. While the mere initiation of an internal investigation into an employee does not necessarily constitute an adverse employment action, see Rademakers v. Scott, 350 F. App'x 408, 412-13 (11th Cir. 2009); Diaz v. Miami Dade Cnty., 09-21856-CIV, 2010 WL 3927751, at *7 n.9 (S.D. Fla. Aug.

17, 2010), where the investigation ultimately leads to the plaintiff's termination, it can be sufficient if it would dissuade a reasonable worker from bringing a charge of discrimination. See Entrekin v. City of Panama City Florida, 376 F. App'x 987, 995 (11th Cir. 2010). Here, the IA ultimately led to Hughes' termination, and would have dissuaded a reasonable worker from bringing a charge of discrimination.

Plaintiff must also demonstrate that there was a causal relationship between the protected activity and the adverse action. Chapter 7, 683 F.3d at 1258. This element is construed broadly, so that a plaintiff must only prove that the two events are not completely unrelated. Goldsmith, 513 F.3d at 1278. However, the person making the employment decision must be aware at the time of the adverse employment action that plaintiff engaged in protected conduct. Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000). Mere proximity in time may be sufficient to establish relatedness where the temporal relationship is very close. Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1182 (11th Cir. 2010).

Hughes alleges that the "timing and continual nature of the retaliatory acts" demonstrate a causal connection. (Doc. 25 at 18). Here, the close proximity between Hughes' protected expression and the initiation of the IA is sufficient to demonstrate a causal connection if Chief Gilmore was aware of Hughes' EEOC charge before she made the decision to initiate the IA. Plaintiff sent a notice of an EEOC charge of discrimination to Chief Gilmore on October 22, 2010. (Doc. 24-13). On October 25, 2010, he hand-delivered a letter to the City Manager, which included the grounds for his EEOC complaint. (Doc. 24-5). That same day, Chief Gilmore upgraded the supervisor's

investigation, which had been going on for months, to the more serious and formal IA. (Doc. 24-12).

There is no decisive evidence in the record as to whether Chief Gilmore knew about Hughes' EEOC charge when she decided to initiate the IA. At oral argument, Plaintiff's counsel stated that it was her recollection that Chief Gilmore acknowledged in her deposition that she had received the complaint before initiating the IA. Yet, Chief Gilmore's deposition was not filed with the Court by either party. When asked whether Chief Gilmore knew about the complaint when she initiated the IA, defense counsel said, "I don't think the evidence would show that", but did not point to any evidence supporting her assertion.

Viewing the evidence in a light most favorable to Hughes, the Court cannot rule out that a jury could reasonably find that Chief Gilmore knew about Hughes' EEOC charge when she decided to initiate the IA. Evidence that notice of the charge was sent to her three days prior, as well as evidence that the City Manager was made aware of the complaint on the same day that Chief Gilmore initiated the IA, provide sufficient circumstantial evidence to support Plaintiff's assertion that Chief Gilmore knew about the charge before she decided to initiate the IA. The very close proximity in time is therefore sufficient to create an issue of fact regarding causation.

As Plaintiff has established a prima facie case of retaliation, the burden shifts to Defendant to provide a legitimate, non-retaliatory reason for the adverse action. Goldsmith, 513 F.3d at 1277. The only non-discriminatory reasons given for adverse employment action in Defendant's Motion for Summary Judgment are related to the

14

decision to terminate Plaintiff's employment. (Doc. 20 at 26). In its reply, Defendant does not provide non-discriminatory explanations for any of the additional adverse employment actions Plaintiff complains of, including the decision to institute the IA. (See Doc. 28).

Even if the Court were to supply Defendant's likely proffered reason, that the IA was instituted once it became clear that Hughes had lied,[6] Hughes would still create an issue of fact regarding pretext. The decision to upgrade the investigation came amidst an atmosphere in which Plaintiff had claimed that he was working in a hostile environment. Moreover, there is evidence that supervisor's investigations are usually used only for minor issues that would not result in suspension or any loss of benefits. (Doc. 24-73 at 4-5). Yet, immediately after Plaintiff informed Defendant that he would be filing a charge of discrimination with the EEOC, the investigation, which had been ongoing for months, was escalated into an IA that would ultimately lead to his termination. While Hughes' evidence of pretext is not strong, the Court, after reviewing the entire summary judgment record, determines that Hughes has offered sufficient facts to rebut the proffered reason given for the institution of the IA and (barely) survive Defendant's motion for summary judgment.

Accordingly, it is hereby

**ORDERED**:

---

[6] Chief Gilmore stated in her affidavit that she decided to convert the investigation into an IA because it appeared that Hughes had lied and because Barfield had become frustrated due to the complexity of the investigation. (Doc. 20-7 at 7)

1. Defendant's Motion for Summary Judgment (Doc. 20) is **GRANTED** as to Count One (race discrimination) and **DENIED** as to Count Two (retaliation). The Court will withhold entry of judgment on Count One until the case has concluded.

2. The Court will issue a separate Order scheduling the case for trial.

**DONE AND ORDERED** in Jacksonville, Florida this 28th day of March, 2014.

_____
TIMOTHY J. CORRIGAN
United States District Judge

w.
Copies:
Counsel of record